UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE

TERRY L. DAWKINS,                    )
                                     )
              Petitioner,            )
                                     )
v.                                   )      Nos. 2:11-cv-24 and 2:06-cr-20(3)
                                     )      *Judge Greer*
UNITED STATES OF AMERICA,            )
                                     )
              Respondent.            )

## MEMORANDUM OPINION

Acting *pro se*, Terry L. Dawkins ["petitioner" or "Dawkins"] has filed this motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 and a supporting brief, [Docs. 477 and 478].[1]  In his pleading and accompanying brief, Dawkins alleges three main grounds for relief: (1) that, in multiple instances, his trial counsel gave him ineffective assistance, (2) that his appellate counsel gave him ineffective assistance, and (3) that there is newly discovered evidence demonstrating that the prosecution's star witness fabricated testimony against petitioner.  Dawkins also has filed a motion to amend his § 2255 motion to assert a claim for a lower sentence, based on Sentencing Guidelines Amendment 742.

### I.  Motion to Amend

The Court turns first to the motion to amend.  At the time Dawkins was sentenced, § 4A1.1(e) of the Sentencing Guidelines provided that either one or two criminal history points were to be added if the defendant committed the instant offense less than two years following release from confinement on a sentence counted under U.S.S.G. § 4A1.1(a) or (b).  *See* U.S.S.G. § 4A1.1(e) (2007).  Amendment 742, which became effective on November 1, 2010—more than

---

[1]       Each document will be identified by the court file number assigned to it in the underlying criminal case.

two years after Dawkins was sentenced–eliminated those so-called "recency points" from the calculation of a defendant's criminal history category under § 4A1.1(e).

Petitioner does not indicate where in his Presentence Investigation Report ["PSR"] those recency points were added. The PSR shows that he received two points, under § 4A1.1(d), for being on probation at the time he committed the offenses of conviction, but the PSR does not show that he received any recency points under § 4A1.1(e).

Moreover, if recency points had been added to Dawkins's criminal history score, the Court could do nothing for him since Amendment 742 is not retroactive to a sentence imposed prior to its effective date, as was petitioner's. *See* § 1B1.10(c) (listing amendments that may be applied retroactively); *United States v. Click*, 2012 WL 6771970, *11 n.14 (E.D.Ky. Dec. 11, 2012) (listing cases which hold that Amendment 742 is not retroactive). The Court is not required to allow amendments to a § 2255 motion to add claims which lack a legal and factual basis, a description which fits the proposed amendments, because that would be an exercise in futility. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

In addition, the one-year statute of limitations for filing § 2255 motions, *see* 28 U.S.C. § 2255(f), also applies to motions to amend. *Mayle v. Felix,* 545 U.S. 644, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005). Petitioner had one year from the date his conviction became final, which happened on February 22, 2010, when the Supreme Court denied his petition for a writ of certiorari, to file his § 2255 motion and any motions to amend. The § 2255 motion was timely filed on January 22, 2011; but the motion to amend, filed on February 4, 2013, was untimely.[2]

Even where a statute of limitations has lapsed, a claim which relates back to a claim offered in a timely-filed pleading is itself considered to be timely under Rule 15(c) of the Federal

---

[2] Both dates are derived from application of the "mailbox rule" announced in *Houston v. Lack*, 487 U.S. 266, 271 (1988), which deems a prisoner's action to be filed on the date that it is properly delivered to the prison officials pursuant to the prison's established procedure for prisoners' mail.

Rules of Civil Procedure. Nothing concerning the recency points was alleged in the original § 2255 motion, so as to permit the proposed newly-minted claims to relate back to the timely-filed claims in the § 2255 motion. Thus, the motion to amend, in addition to its other fatal deficiencies, is also time-barred.

For these reasons, the motion to amend will be **DENIED**.

## II. § 2255 Motion to Vacate

This leaves pending before the Court the § 2255 motion; the United States's response to the motion to vacate, supported by several affidavits, including one each by petitioner's trial counsel, L. Kirk Wyss, and his appellate counsel, James J. Lonon; and Dawkins's reply to that response, [Docs. 528, Attachments 1-3, and 529]. For the reasons which follow, petitioner's motion to vacate will **DENIED**.

### A. Procedural Background

In Count One of a fourteen-count superseding indictment returned by the federal grand jury on June 13, 2006, [Doc. 9], Dawkins was charged, along with multiple co-defendants, with conspiring to distribute and possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and § 846. Count Two alleged that Dawkins conspired to distribute and possess with the intent to distribute fifty grams or more of cocaine base, also in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and § 846. Counts Five and Six alleged that petitioner had aided and abetted the distribution of five grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2.

Dawkins and two of his co-defendants proceeded to a jury trial, where he was convicted of all counts and sentenced to serve 180 months' of imprisonment, to be followed by four years of supervised release. Prior to his sentencing, Dawkins moved for a new trial, but the motion

was denied, [Docs 370 and 376]. Following his sentencing, Dawkins unsuccessfully appealed his conviction and sentence. *United States v. Young*, 347 Fed. Appx. 182, 2009 WL 3073164 (6th Cir. Sept. 28, 2009), *cert. denied*, 559 U.S. 957 (Feb. 22, 2010). On January 22, 2011, after his direct appeal was concluded, Dawkins submitted the instant § 2255 motion and supporting memorandum brief.

## B. Standard of Review

This Court must vacate and set aside Dawkins's conviction upon finding that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack . . ." 28 U.S.C. § 2255(b).

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States,* 285 F.2d 733, 735 (6th Cir. 1961). "Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing." *Green*, 454 F.2d at 53; *O'Malley*, 285 F.2d at 735. A motion that merely states general conclusions of law without substantiating allegations with facts is without legal merit. *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson*, 940 F. Supp. 167, 171 (W.D. Tenn. 1996).

To warrant relief under 28 U.S.C. § 2255 because of a constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted) (§ 2254 case); *Clemmons v. Sowders*, 34 F. 3d 352, 354 (6th Cir. 1994); *see also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying *Brecht* to a § 2255 motion). A petitioner

must prove that he is entitled to relief by a preponderance of evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

Under Rule 8(a) of the Governing Rules, the Court is to review the answer, any transcripts, and records of prior proceedings and any material submitted under Rule 7 to determine whether an evidentiary hearing is warranted. If the motion to vacate, the answer, and the records of the case show conclusively that the petitioner is not entitled to relief under § 2255, there is no need for an evidentiary hearing. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986). The Court **FINDS** no need for an evidentiary hearing in the instant case.

### C. Factual Background

The facts are taken from the Sixth Circuit's opinion on direct review of Dawkins's conviction. *See United States v. Young*, 347 Fed. Appx. at 182, 184. According to proof presented at trial, Rickey Story was at the helm of a conspiracy to sell considerable amounts of cocaine and cocaine base in the Eastern District of Tennessee. The conspiracy ultimately involved fourteen people, eleven of whom pleaded guilty. Story would receive the drugs from two sources: (1) a source called "Carlos," who was never apprehended, and (2) a source in South Carolina, which evidence at trial indicated was Connie Young, one of two of Dawkins's co-defendants who stood trial with him. A Title III wiretap was authorized to intercept calls on Story's cellular telephone and the authorization was extended thirty days and also extended to the interception of text messages. Much of the evidence presented at trial was connected to the intercepts.

At trial, Drug Enforcement Task Force agent David Chambers identified Dawkins as the man who had delivered crack cocaine in November of 2005 to the Sonic Drive-In in Johnson City, Tennessee, to a confidential informant ["CI"]. Chambers acknowledged that he described

that man as tall, while Dawkins was short, but explained that Dawkins was on an embankment at the time Chambers observed him. The CI likewise identified Dawkins as the man who sold him crack cocaine in the November 2005 controlled drug buy witnessed by Chambers. Story testified that he had sent Dawkins to sell to the CI in November and that Dawkins had accompanied him when Story sold cocaine to the CI in October.

Testimony established that Dawkins was deeply connected to Story's drug sales, including two witnesses's description of Dawkins as Story's right-hand man. One witness testified that Dawkins helped Story cook cocaine and distribute it and another witness, who had lived with Story for a time, testified that Dawkins made daily cocaine deliveries for Story.

Testimony likewise connected Dawkins to Story's supplier. Story testified that, in 2005 and 2006, he would go to South Carolina several times a week with Dawkins to acquire cocaine. Another witness testified that he heard Dawkins and Story talk about how they would go to South Carolina to acquire cocaine. Still another witness indicated that Dawkins provided the contact in South Carolina through which Story and Dawkins acquired cocaine. This same witness also stated that Dawkins and Story brought four or five ounces of cocaine from South Carolina once or twice a week and that he had gone with Story and Dawkins on one of the trips. This witness also identified Dawkins's voice on one of the recorded calls and stated that, in the conversation, Dawkins and Story were talking about collecting money.

Story's wife, who was also a co-defendant, testified that at times Story received his supply of crack cocaine from Dawkins. Though she initially stated that Dawkins got the cocaine from North Carolina, in response to a follow-up question, she stated she meant South Carolina. Story's wife also testified that Dawkins and Story talked about trips to South Carolina, that Story would tell her about those trips, and that they would bring two or three ounces of cocaine back

6

from each trip. She also stated that oftentimes she saw Dawkins use Story's phone to arrange sales.

### D. Discussion

In his § 2255 motion, Dawkins offers various purported misdeeds on the part of his counsel to illustrate his claims that he received ineffective assistance. According to the face of the motion, petitioner was represented by L. Kirk Wyss at trial and by James J. Lonon at sentencing and on direct appeal. Twelve claimed errors are attributed to Attorney Wyss and three to Attorney Lonon. Petitioner also asserts, as his final claim, that newly discovered evidence can serve as a basis for § 2255 relief.

### 1. Ineffective Assistance

### a. Relevant Law

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a break down in the adversary process that renders the result unreliable.

7

*Id.* As with any other claim under § 2255, the burden of proving ineffective assistance of counsel is on the movant. *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A petitioner asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Moreover, counsel's conduct is strongly presumed to fall within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

The second prong of the *Strickland* test requires that the petitioner show that counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. The petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The *Strickland* Court emphasized that both prongs must be established in order to meet the claimant's burden, and if either prong is not satisfied the claim must be rejected, stating:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one . . . . If it is easier to dispose of an ineffectiveness

8

claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

*Id.* at 697.

**b. Analysis**

The § 2255 form petition stated the claims in a bare bones fashion, thus petitioner referred to and relied upon his accompanying brief for the factual development of those claims. Consequently, the Court has arranged its discussion to address the claims in the order in which they are listed in the brief.

> *i.* *Counsel failed to challenge the racial composition of jury venire from which Dawkins's petit jury was drawn.*

Dawkins submits, as his first ineffective assistance claim, that the jury pool from which his petit jury was drawn, had one African American and that this shows apparent racial discrimination in jury selection process in the Eastern District of Tennessee ["EDTN"], as reflected in the jury pool. (Dawkins is African-American.) Petitioner thus concludes that this deprived him of a fair trial and that his counsel should have made an objection on this basis.

According to Dawkins, based on voter registration and census figures, EDTN should produce a jury venire which fairly represents the 21.3% jury-eligible African-Americans in the district. Petitioner argues that, due to having one African-American on his jury venire panel and to the systematic under-representation demonstrated in jury panels prior to petitioner's trial, counsel should have challenged the jury selection process pursuant to the Jury Selection and Service Act of 1968 and, citing to *Duren v. Missouri*, 439 U.S. 357 (1979) and *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1054), the Due Process Clause. Dawkins alleges that, had

counsel so done, there is a reasonable probability that he could have established a prima facie case that the selection process did not produce a fair cross-section of the community.

In response to this claim, the United States argues that Dawkins has failed to: (1) show that the jury selection process in this district systematically excludes non-Caucasians or (2) satisfy any of the three factors which are required to establish a prima facie case of discriminatory jury venire selection. The United States relies on Magistrate Dennis Inman's Report and Recommendation in *United States v. Maddox*, Criminal Number 2:09-cr-45, which it describes as a case where Judge Inman found that EDTN plan in effect since 2005 randomly selects jurors from voter registration lists of 10 counties in this division. According to the United States, Judge Inman reviewed 2000 census records in this division and found that African Americans comprise only 2.13% of the population and that there had been no substantial underrepresentation of African-Americans on the qualified jury wheel of this court since 2005 and that nothing about the procedure used to select jurors diminished the chances of the selection and service of any particular person.

The Court takes judicial notice of its own cases and records, including *United States v. Maddox*, Criminal Action No. 2:09-cr-45, and the Sixth Circuit's recent decision in that case, [Doc. 930, *United States v. Miller, et al.*, Case Nos. 11-5829, 11-5837, 11-5860, 11-6192, 11-6196, 11-6198, __ Fed. Appx. __, 2014 WL 1303230 (6th Cir. Apr. 4, 2014)].

Petitioner indicates, in his reply to the government's response, that he has made an "indirect case" by pointing to the fact that only one African-American juror was selected within the jury pool and that he has established a prima facie "indirect challenge" to the jury pool, which carries with it a presumption of discrimination towards African-Americans—a presumption which the government has failed to rebut. Dawkins also argues that he has shown

that African Americans are excluded from service and that their representation is not reasonable when compared with the overall community. Dawkins further requests that, if at this point the Court does not find that African-Americans were excluded from previous panels and were excluded as a result of the jury selection plan, he be permitted to expand the record and allowed to conduct further discovery to show systematic exclusion in prior cases.

A criminal accused has a right to a trial by an impartial jury drawn from a fair cross section of the community, which is rooted in the Sixth Amendment. *See Taylor v. Louisiana*, 419 U.S. 522, 527 and 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). While there is no right "to a jury of any particular composition, [] the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id*. at 538.

To establish a prima facie violation of the fair-cross-section requirement, as secured by the Sixth Amendment, petitioner must prove that: (1) a group qualifying as "distinctive" (2) is not fairly and reasonably represented in jury venires, and (3) "systematic exclusion" in the jury-selection process accounts for the underrepresentation. *Berghuis v. Smith*, 559 U.S. 314, 327-28 (2010) (citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)).

As petitioner correctly concludes, African-Americans are a recognized and distinctive group in the EDTN, and he thus has satisfied the first component of the *Duren* test. It is the second and third component which present a problem for him.

The petitioner's jury venire in August of 2007 would have been drawn from the master jury wheel filed in this division in 2005. In the *Maddox* case, the affidavit prepared by the chief deputy clerk of EDTN, as ordered by Judge Inman, and the affiant's explanation of the jury selection process and the reports detailing the demographic make-up of the jury pool in this

division in 2005 would be relevant to the issues in petitioner's case. According to those reports, filed pursuant to 28 U.S.C. § 1863(a), in 2005, African-Americans comprised 1.86 percent of the qualified jurors in the master jury wheel filed and 2.2 percent of the general population of voting age in this division.

As the magistrate judge related, one way to compare these numbers is to look at the difference between the percentage of African-Americans in the jury wheel and in the general population. This difference is less than one percent. The other way to evaluate the degree of underrrepresentation is to look at the ratio between the percentage of African-Americans in the jury wheel and in the general population. The percentage of African-Americans in the jury wheel represented about 84.5 percent of the rate of African-Americans in the general population. These percentages are lower than rates of underrepresentation found to be substantial by the Supreme Court, and it is even less substantial when taking into account the relatively small size of the overall population of African Americans in the EDTN. The Court finds that the second prong of the *Duren* test has not been satisfied.

As to the third component, "systematic exclusion" in the jury-selection process, the jury wheel is based on a list of registered voters which have been screened for their qualifications and from this wheel prospective jurors are selected at random. And voter registration lists, as the Sixth Circuit has observed, "are the presumptive statutory source for potential jurors." *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008). At any rate, Dawkins has not suggested how this method of deriving a jury venire in any way excludes African-Americans from the opportunity to serve on a federal criminal jury in this division or any other division in this district. Therefore, Dawkins has failed to meet the "systematic exclusion" component in *Duren*.

As the foregoing analysis shows, this claim has no merit. Hence, there is no need to allow Dawkins to engage in discovery with respect to this issue because the Court has the information needed to evaluate and find wanting his "fair cross section" claim.

### ii. Counsel failed to challenge the Title III process and wiretap evidence.

Dawkins's next claim is bottomed on a Title III wiretap, which was initiated in February of 2006 on co-defendant Rickey Story's cell phone. The wiretap, initially authorized for thirty days, was extended an additional thirty days and to include text messages. The intercepted communications were used against Dawkins at trial. According to Dawkins, counsel should have challenged probable cause for wiretap; the failure to exhaust other investigative techniques before resorting to a wiretap; the improper expansion of Title III authorization to include text messages; false statements contained in the affidavit; and other violations of the statute, 18 U.S.C. § 2510, *et seq*. Indeed, Dawkins states that he specifically directed counsel to file those motions to challenge the wiretap evidence.

More specifically, petitioner maintains that the wiretap evidence should have been challenged based on the "necessity requirement" in 18 U.S.C. § 2518(1)(c), which dictates that a wiretap application contain a full and complete statement as to whether other investigative procedures have been tried and failed or why those other procedures reasonably appear to be unlikely to succeed if tried or to be too dangerous, so as to justify a wiretap. Petitioner maintains that the affidavit supporting the wiretap contained general, unspecific, and conclusory statements as a pretext for acquiring a wiretap and that the application to extend the wiretap was likewise deficient as it did not provide a sufficient factual basis for the extension or the inclusion of text messages.

Moreover, petitioner contends that counsel specifically was advised that the agents provided false and misleading information in the affidavits supporting the wiretap, which justified a hearing as enunciated in *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978). Dawkins's position is that, had counsel filed the appropriate motions(s) challenging the validity of Title III wiretap evidence, there is a reasonable probability that the Court would have determined that the wiretap procedure did not comport with Title III requirements and would have suppressed the wiretap evidence. And had this evidence been excluded, Dawkins insists that this would have resulted in a different outcome at trial.

At the outset, the United States points out in its response that petitioner has not identified the part of the affidavit which "contained general, unspecific statements as pretext" or the part of the application for authorization to extend the wiretap which lacked probable cause to support the extension of the wiretap. The United States argues that, at trial, Agent Chambers testified as to the process used to obtain the wiretap and the extension, including text messages, and the process used to monitor the communications. Respondent further argues that law enforcement agents testified about their participation in monitoring the communications, their verification of the accuracy of the calls and text messages, and the reliability of transcripts of the calls. Petitioner has replied and, citing to *United States v. Rice*, 478 F.3d 704 (6th Cir. 2006), he compares the affidavit in *Rice* to the affidavit in his case. This comparison, so asserts Dawkins, shows that the affidavit in his case contained the same misstatements and omissions.

In *Rice*, the affidavit for the Title III order stated that the agents who were applying for the authorization for a wiretap had conducted surveillance and had reason to believe the subjects were violent, had used threats of violence, and carried firearms. The *Rice* court found that no surveillance had been conducted and no evidence obtained which confirmed that the subjects of

the wiretap carried a firearm and that the affidavit was false. *Rice* is factually distinguishable

from petitioner's case. Here, the affidavit Chambers submitted in support of the wiretap order

stated that an investigation had been conducted, that surveillance methods had been employed,

and that a CI had been used to engage in controlled buys, some of which had been recorded.

There is no suggestion in the record, beyond petitioner's unsupported contention, that the

Chambers affidavit, which supported the wiretap order, contained any misstatements or

omissions.

Dawkins next argues that the Chambers affidavit shows that the wiretap was the first step

in the investigation of his criminal activities, implying that the affidavit had to justify the

interception of *his* communications by showing that other investigatory methods had been

exhausted. This argument is doomed. There was no need to have exhausted other methods of

investigation into petitioner's illicit drug transactions or the facts related to the exhaustion of

those methods detailed in the affidavit in order to have Dawkins's communications recorded and

used against him at trial. As the Eleventh Circuit has stated: "We have never required that a

defendant be named in a wiretap application or accused of using the suspected telephone before

evidence obtained by the wiretap can be used against him. One of the objects of wiretapping is to

ascertain the full extent of participation in criminal activity, and we need not limit

retrospectively the pool of potential defendants." *United States v. Hyde*, 574 F.2d 856, 862 (11th

Cir. 1978); *see United States v. Donovan*, 429 U.S. 413, 439 (1977) (A defendant's intercepted

conversation showing his involvement in illegal conduct was admissible though he was not

named in the initial application.).

Because a motion to suppress the evidence procured through the wiretap on the bases

now sugested by petitioner would not have succeeded, trial counsel did not provide ineffective

assistance by failing to pursue such a futile motion.  Put simply, counsel has no duty to assert a legally baseless claim, *United States v. Martin*, 45 Fed. Appx. 378, 381 (6th Cir. 2002); *Krist v. Foltz*, 804 F.2d 944, 946-47 (6th Cir. 1986), and cannot be ineffective when he does not raise that claim.  *Greer v. Mitchell*, 264 F.3d 663, 676 (2001).  Counsel committed no error in this respect.

### iii.  Counsel failed to advise petitioner properly concerning plea negotiations, sentence exposure,  and whether to plead guilty or risk a trial.

Dawkins alleges that Attorney Wyss failed to explain the government's case against him, including the criminal charges in the superseding indictment, the facts or the evidence against him, or the effect the Federal Rules of Criminal Procedure had on the evidence; failed to pursue plea negotiations; and failed to apprise him of the application of the Federal Sentencing Guidelines to his case and the statutory sentencing scheme under 18 U.S.C. § 3553.

Petitioner suggests that he was amenable to pleading guilty, but simply could not agree to a cooperation agreement, and that, contrary to counsel's advice, he could have pled guilty without any plea agreement and could have received credit under USSG § 3E1.1(a), for acceptance of responsibility.  Petitioner alleges that, had Attorney Wyss provided him with competent advice, he would not have gone to trial and, instead, would have pled guilty and received a lesser prison sentence than he did receive.

Petitioner's allegations are not supported by the record.  Just prior to the scheduled trial, petitioner submitted a letter, which was deemed to be a motion to substitute counsel, and three days later the Court held a hearing on the matter, [Doc. 240, letter motion (under seal); Docket Entry of July 27, 2007, Setting Motion H'rg; Doc. 443, Mot. Hr'g Tr.].  At the hearing, when the Court asked Dawkins whether he had disclosed any facts to counsel to support a defense to the charges, Dawkins responded that "every fact I give him, it turns to fiction."  The Court

16

advised Dawkins that counsel's " job is to tell you honestly what the proof is against you, to evaluate whatever defense you've got and to advise you accordingly." Petitioner then stated, "I ain't saying he may not tell me the truth, I saying, I'm saying I don't feel effective counsel.  I don't get nothing out of what we talk about, nothing.  I mean .... right now I don't feel like he's leading me to nothing." Petitioner also complained that he was not hearing anything positive from counsel about his case, only negative things.

From petitioner's own statements, the clear and obvious implication is that counsel explained the government's case against petitioner, including the facts connected to the charged offenses and the evidence to be adduced against him by the prosecution.  Furthermore, the United States has attached to its response Attorney Wyss's affidavit, [Doc. 528-2, Affidavit of L. Kirk Wyss].  In his affidavit, Attorney Wyss avers that he met frequently with Dawkins, that his client was fully advised concerning his situation at every stage of the proceedings and, more specifically, was completely apprised of the evidence against him, of the very high risk of conviction in the event of trial, and of the extent of potential penalties that lay before him if he were convicted.

Dawkins understandably yearned to hear something positive from counsel, but that yearning does not mean that counsel gave ineffective assistance when he relayed to his client the facts of the case and the applicable law.  Obviously, counsel's view of the case against Dawkins presented a different and more negative picture than perhaps his client wished to hear.  Yet, an attorney has no duty to relay to his client that he has a strong defense to the prosecution's case, when the opposite is true.

As concerns Dawkins's complaint that counsel was unfamiliar with the Rules of Criminal Procedure, the Court explained, at the motion hearing, that counsel was perfectly familiar with

17

the Rules of Criminal Procedure. When petitioner complained that he had received a copy of the rules two days earlier and had not had time to become well-versed in the rules, the Court essentially found the issue to be meritless.

Regarding counsel's alleged failures which were tied to guilty plea negotiations, at the motions hearing, the Court quoted the part of the letter motion, where Dawkins stated that counsel had told him that he was making a mistake going to trial and that he should plea bargain this case, [Doc. 443, Mot. Hr'g Tr. at 7]. Later, Dawkins stated: "I ain't asking for no plea. I want to go to trial and fight for my life," [*Id*. at 11]. Still later, Dawkins was equivocal, expressing a willingness to plead, so long as the terms were amenable to him, " I'm willing to plea to my role. We ain't even got a plea for my role. I want to accept responsibility for what I done," then changing positions by rejecting that he had committed the offenses charged against him, "You got me—I'm being over charged. I'm being hemmed up. "

Attorney Wyss, in his affidavit, testifies that a guilty plea was recommended, but that petitioner was disinclined to take that recommendation, insisting that he was not part of any conspiracy and did not know Co-defendant Young, despite the information collected from the wiretap on Story's cell phone. In Attorney Wyss's opinion, which presumably he expressed to his client, the wiretap evidence would be admitted because Story was cooperating with the government and would be testifying on its behalf.

A defendant has a Sixth Amendment right to counsel, including effective assistance from that counsel, during the plea-bargaining process. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012) ("The constitutional guarantee applies to pretrial critical stages that are part of the whole course of a criminal proceeding, a proceeding in which defendants cannot be presumed to make critical decisions without counsel's advice."). However, "a defendant has no right to be offered a

plea," *Missouri v. Frye*, 132 S. Ct. 1399, 1410 (citing *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977)), and "[g]enerally, decisions whether to initiate plea bargaining with prosecutors are precisely the kind of strategic decisions which are best left to the sound discretion and professional judgment of defense counsel, and are beyond the Court's purview." *Talley v. United States*, 2006 WL 3422997, at *13 (E.D.Tenn. Nov. 27, 2006).

Here, there is nothing to indicate that plea negotiations were in the offing. Rather, the claim as argued in Dawkins's brief is that counsel "failed to properly pursue plea negotiations," [Doc. 478, Petr.'s Br. at 7]. In a seemingly complete about face, Dawkins complains, in his reply, that a plea offer was not communicated to him, [Doc. 529, Petr.'s Reply at 7]. Even so, Dawkins never confirms that a plea offer was extended by the government. Indeed, at the motion hearing held two days before his trial was scheduled, Dawkins stated, "I ain't asking for no plea. I want to go to trial and fight for my life," [Doc. 443, Mot. Hr'g Tr. at 11]. True, Dawkins points out that the United States does not dispute that a plea bargain was in fact offered to Dawkins, but his own "affidavit" is likewise vague on this point, as petitioner states that "[t]here was no alternative plea agreement, nor did attorney Wyss tell me I could plead guilty without a plea agreement," [Doc. 478-1, "Affidavit" of Terry L. Dawkins at 3]. Attorney Wyss avers that "a plea of guilty was recommended," but does not state that a plea offer actually ever materialized.

Petitioner cites to *United States v. Griffin*, 330 F.3d 733 (6th Cir. 2003), as support for his position, but *Griffin* is distinguishable on its facts. In *Griffin*, the government conceded that a plea offer had been made and that counsel had not conveyed the plea deal to the petitioner. Here, no such concessions have been made. Here, though at times Dawkins asserted that he was not part of any conspiracy, at the motion hearing he stated that he wanted to take responsibility

for his role in the conspiracy, but then explained that he did not agree with the government, as reflected in the offenses charged, as to what that role had been.

But assuming, without finding, that a plea offer was on the table, there is nothing to indicate that petitioner would have agreed to plead guilty to the charges against him, given his often expressed wish to go to trial and to "fight," in combination with his belief that he was being overcharged with the offenses and being hemmed in by those charges. Another factor to be considered is Dawkins's adamant opposition to cooperating with the prosecution, together with the slim likelihood that any proffered plea agreement would omit a cooperation provision, given that those provisions were included in the plea bargains of eleven of Dawkins's co-defendants who testified against him at trial.

In view of the circumstances described above, the Court finds that petitioner has not demonstrated a reasonable probability that he was ready to accept any plea offer, under terms which were certain to be included, rather than one containing terms scripted to his liking. *Frye*, 132 S. Ct. at 1409 (To show prejudice, a petitioner "must demonstrate a reasonable probability [he] would have accepted the earlier plea offer" had it been conveyed to him.). Under these circumstances, the Court finds no ineffective assistance of counsel.

### iv. *The attorney-client relationship between counsel and petitioner was completely broken.*

In this claim, petitioner makes the allegations which follow. Dawkins was forced to go to trial with the assistance of an attorney with whom he could not communicate. During the hearing on Dawkins's motion to substitute counsel, the Court engaged in what Dawkins characterizes as "a perfunctory judicial inquiry in response" to petitioner's repeated complaints. When queried by the Court, Dawkins detailed the problems he purportedly was experiencing with Attorney Wyss. Listed among those claimed problems was counsel's refusal to discuss his

client's case with him or to investigate or to research grounds to challenge the wiretap and other evidence. Dawkins believed that the relationship had turned rancorous and hostile, making communications with counsel impossible. Yet, this Court denied Dawkins's motion to substitute relief counsel and took no action to remedy the discord. Nothing changed following the inquiry and the conflict worsened during the trial.

In its response, the United States points out that the Court denied petitioner's motion for a new attorney for lack of sufficient merit and that he has provided no evidence that his counsel failed to provide an adequate defense, despite conflicts in their relationship. Furthermore, so argues the United States, at the conclusion of the government's proof at trial, petitioner expressed his appreciation for counsel, [Doc. 360, Trial Tr. at 49]. Therefore, the United States insists, this claim has no sound basis and should be denied.

The claim made in the § 2255 motion was that petitioner and counsel had conflicting views concerning how best to investigate, prepare, and present the defense, whereas, in petitioner's reply to the United States response, he has framed the issue as whether counsel "actively represented conflicting interests," involving "an actual conflict of interest which adversely affected his lawyer's performance." *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 345 (1980)). This transmogrification of the issue may be nothing more than inartful *pro se* draftsmanship, but if it is intended to allege a substantive claim, the claim is baseless. This is so because Dawkins has not demonstrated an actual conflict, nor that any such a conflict affected counsel's performance.

As to the petitioner's original claim regarding his perceived problems with Attorney Wyss, the same day the motion to substitute was filed, the Court set a hearing in the matter for three days later, indicating the seriousness with which the Court treated the motion. The hearing

was full and complete and petitioner had an opportunity to express criticisms or reservations he had about counsel's representation. The Court's queries were probing, responsive to each of petitioner's criticisms of counsel, and where further inquiry was required to understand petitioner's expressed problems with counsel, the Court asked those questions to get to the heart of petitioner's unease about continuing the proceedings with Mr. Wyss's representation.

By actively interpreting petitioner's answers, the Court understood petitioner to be frustrated by counsel's valid iteration of the applicable law and his discouraging assessment of the chances of success of a motion to suppress the wiretap evidence. That assessment, along with counsel's advice to plead guilty, based on the quality and quantity of the admissible evidence which the government had collected, made it seem to petitioner as though counsel was not "fighting" for him. The Court's inquiry, which was far from perfunctory, mechanical, or superficial, delved deeply into the reasons for petitioner's dissatisfaction with counsel. The Court discerned that petitioner's desire for new counsel who would "fight" for him, arose from petitioner's dismay with counsel's straightforward evaluation of the government's case and with counsel's advice to plead guilty. While obviously this was unwelcome news for petitioner, it provided no valid basis for finding a breakdown in the attorney-client relationship, resulting in a total lack of communication preventing an adequate defense. *United States v. Iles*, 906 F.2d 1122, 1130, n 8 (6th Cir. 1970). Indeed the Court's assessment of the attorney-client relationship was proved to be accurate when petitioner expressed his satisfaction with counsel before the defense rested.

An indigent criminal defendant has a right to counsel, but not an absolute right to counsel of his choice; therefore, to warrant substitution of counsel, the defendant must show "good cause." *Id*. at 1130-31. At the conclusion of the motion hearing, the Court determined that

Dawkins's complaints about counsel were legally baseless and, in effect, found that he had failed to show "good cause" to relieve Attorney Wyss from the representation. This claim, now raised as a instance of ineffective assistance, is likewise groundless and merits no relief.

### v. Counsel failed to request special voir dire of the jury venire concerning racial relations.

In his next claim, Dawkins suggests that potentially explosive racial dynamics might have inflamed racial prejudice in average, reasonable jurors sitting on a jury panel in the EDTN. (The obvious inference to be drawn from petitioner's allegations is that prejudice against interracial relationships is pervasive in this district.) Petitioner points to evidence of sexual relationships with Caucasian woman on the part of his co-defendants, who are African-Americans. Also cause for concern was the fact that Story, a co-defendant who was testifying for the government under a cooperation agreement, was having sexual relations with at least one Caucasian minor and, thus, had committed the offense of contributing to the delinquency of a minor. Furthermore, according to prosecution arguments, petitioner was Story's right-hand man, which could have suggested to the jury that petitioner similarly had sex and corrupted innocent white girls with crack cocaine and easy money.

Thus, counsel should have taken measures to identify and eliminate jurors who were prejudiced against or morally objected to inter-racial sexual relations. But for counsel's failure to request special voir dire examination to uncover potential jurors's prejudices involving interracial intimate relationships, prejudices which are prevalent in this district, certain jurors would not have been qualified to serve on petitioner's jury and the outcome of his trial would have been different.

In response, the United States argues that the race of the various co-defendants was not discussed at trial, but points out that co-defendants Amy Leonard (Story's wife) and Deborah Demery (Story's girlfriend) are both Caucasian females and that both co-defendants testified at Dawkins's trial. Also, according to the United States, co-defendant Elisa Grooms is a Caucasian female who was convicted at trial along with petitioner and co-defendant Connie Young. Grooms was Story's ex-girlfriend, and she testified in her own defense at trial that she was fifteen years old when she met Story and was sixteen when she had his child.

In reply, Dawkins simply restates his claim, citing to *Rosales-Lopez v. United States*, 451 U.S. 182, 191 (1981), for its holding that a court must honor a defendant's request to inquire into potential jurors's racial bias, if there is a reasonable possibility that racial prejudice may influence the jury.

The law is well-settled that, in a capital case, questions concerning racial prejudice must be posed to the jury on voir dire if requested by the defense. *Turner v. Murray*, 476 U.S. 28, 36–37, fn. 10 (1986). Yet, there is no similar constitutionally-mandated inquiry in non-capital cases. *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992) ("The Constitution ... does not dictate a catechism for voir dire, but only that the defendant be afforded a fair and impartial jury."); *see also Ristaino v. Ross*, 424 U.S. 589, (1976) (U.S. Constitution does not mandate opportunity to voir dire on racial bias based on mere fact of a black defendant and an alleged victim who is white, especially where general voir dire encompasses impartiality).

Be that as it may, even where the record is silent as to counsel's rationale, counsel's questioning during voir dire is presumed to be a matter of sound trial strategy. *See Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir. 2001); *see also Keith v. Mitchell*, 455 F.3d 662, 676 (6th Cir. 2006) (noting the "particular deference" owed to counsel's decisions when conducting voir dire)

24

(citing *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)). The same presumption holds true regarding questioning concerning racial issues during voir dire. *Mahdi v. Bagley*, 522 F.3d 631, 637 (6th Cir. 2008).

Among the reasons courts have imagined for an attorney's decision not to delve into the racial views of the jurors during voir dire are that such matters are sensitive to most jurors and might underscore to the jury an issue which counsel hoped to avoid. *See Jacobs v. Horn*, 395 F.3d 92, 118 (3d Cir. 2005) ("Counsel reasonably could have believed that probing the jurors' potential racial prejudices might unduly emphasize the racial differences, somehow inject racial issues into a trial where none existed, or taint the jurors' view of [the defendant] and his attorney.") And always, counsel's voir dire decisions must be based on weighing the potential harm that could flow from a voir dire on racial bias against its arguable benefit.

In this case, as the United States points out, petitioner and co-defendant Young were African-American, but the other co-defendant who was tried with petitioner was Caucasian. The co-defendants who testified against him were different races—both African-American and Caucasian. The crime did not involve interracial violence, or a defendant of one race and a victim of another race—indeed, the crimes charged involved drug dealing in which there was no individual victim. *See United States v. Kyles*, 40 F.3d 519, 525 (2d Cir. 1994) (not required to question jury venire about racial bias, since African-American defendant's armed robbery charge unlikely to trigger potential prejudices, given that he did not injure or attempt to injure anyone) Nor was there any evidence that Dawkins himself was involved in an interracial sexual relationship, notwithstanding his argument that the jury might so infer because of Story's involvement in one and because of Dawkins's and Story's close alliance.

Given the sensitivity of this issue to most people, counsel could certainly have determined that the wiser course was not to call attention to race by examining the jurors on their possible racial bias. Given the deference owed to what can only be described as a strategic decision, *see Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997), and the lack of any evidence by petitioner to rebut the presumption that counsel's tactical decision was sound, the Court finds that counsel did not perform deficiently in failing to question prospective jurors about their attitudes towards interracial relationships.

As to prejudice, it is well settled that a petitioner must set forth adequate facts upon which relief may be granted under § 2255. *See, e.g., O'Malley v. United States*, 285 F.2d 733 (6th Cir. 1961) ("Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing"). In his § 2255 motion, petitioner has not listed the names of the "certain jurors" who, due to district-wide "prevailing conventional racial prejudices" against "interracial romantic relationships," were not qualified to serve on his jury, [Doc. 478, Petr.'s Br. at 13].

Thus, Dawkins cannot show prejudice flowing from counsel's failure to voir dire those unidentified jurors on their possible bias against interracial relationships. *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000) (finding that a conclusory statement is insufficient to raise the issue of ineffective assistance of counsel); *Tucker v. United States*, 423 F.2d 655, 656 (6th Cir. 1970) (pure conclusory statements in a § 2255 motion, absent any specific allegations as to how, when, and where the claimed constitutional infringements occurred, would not be credited). Moreover, even if the claim were more factually developed, unless petitioner could show that an identified juror was actually biased against him, he still could not show prejudice from counsel's claimed shortcoming. *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001).

26

***vi.1 Counsel failed to interview and call witnesses favorable to the defense.***
***vi.2 Counsel failed to advise petitioner concerning a severance.***

In the first part of this two-pronged claim, Dawkins contends that he notified counsel that he wanted to call Linda Story, Elisa Grooms, Connie Young and others as witnesses and that he asked counsel to interview various individuals to learn whether they could offer favorable testimony or could reveal the existence of other favorable witnesses. Counsel, so petitioner asserts, failed to conduct these interviews or procure testimony of favorable witnesses.

In its response, the United States points out that Dawkins has not listed the names of any individual(s) which counsel did not interview, after petitioner allegedly asked him to do so. It therefore suggests that because petitioner has not provided the identity – much less the expected testimony – of his proposed witnesses, he cannot show that counsel's failure to interview these individuals was objectively unreasonable.

The Court agrees. While *Strickland* imposes upon an attorney "'the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence,'" *Ramonez v. Berghuis*, 490 F.3d 482, 487 (6th Cir. 2007) (quoting *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005)), petitioner has not identified any potential witnesses (with the exception of Linda Story, Connie Young and Elisa Grooms), nor described their expected testimony to show that such testimony would have been favorable. *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[T]he testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit; [a] defendant cannot simply state that the testimony would have been favorable, [as] self-serving speculation will not sustain an ineffective assistance claim.") (footnote omitted). "A defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) (quotation marks and citation

omitted).

In the absence of this information, the Court is unable to conclude that counsel gave a prejudicial performance in failing to interview and call unidentified witnesses.

As to calling Linda Story as a defense witness, Dawkins has not explained the nature of her testimony, how it would have been helpful to the defense, or even whether she would have been available as a witness. These omissions are fatal to his claim because, absent these details concerning Story's testimony, there is nothing to support a conclusion that counsel's failure to present that testimony resulted in prejudice. *See Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005) (affirming denial of an ineffective assistance claim based on counsel's failure to call witnesses where a petitioner did not "introduce[ ] affidavits or any other evidence establishing what they would have said").

In the second part of this claim, Dawkins asserts that counsel explained that calling Grooms and Young as defense witnesses would not be fruitful because they would refuse to testify, since they were being tried with petitioner. However, counsel failed to advise petitioner that he could move to sever his trial from that of his co-defendants' and that, if the motion were granted, he could call Young and Grooms as defense witnesses. Dawkins asserts that the testimony of Grooms and Young, had they been called to the stand, would have been favorable and would have probably changed the outcome of his trial.

The record refutes that there is any reasonable probability that testimony from Grooms would have would have changed the outcome of Dawkins's trial. This is so because, in fact, Grooms took the stand, testified in her own defense, [Doc. 361, T. Tr. at 53-83], and was subjected to cross-examination by Dawkins's attorney, [*Id*. at 84-85]. Petitioner has not set forth the contents of the testimony Grooms would have offered from the witness stand, had counsel

successfully moved to sever Dawkins's trial from hers, and he has not shown that any such testimony would have been different from what she, in fact, gave at the trial nor that it would have been favorable to his defense. The lack of such a showing defeats this particular claim. *See Ashimi*, 932 F.2d at 650. Therefore, not only is the claim controverted by the record, but it also fails for lack of any demonstration of a prejudicial performance on counsel's part.

As for the alleged failure of counsel to call Young as a witness for the defense, Dawkins has submitted what he had titled as an "affidavit" by Young, in which Young states, *inter alia*, that he did not know Dawkins, that he wanted to testify, and that he would have testified, had Dawkins's trial been severed from his.[3] A similar "affidavit," authored by Dawkins, in which he stated that he did not know Young, was filed Young's case. In considering the "affidavit," the Sixth Circuit noted that, while the document stated that Dawkins was duly sworn, it was not notarized and did not otherwise show that Dawkins was administered an oath by an authorized person. Another flaw, as observed by the Sixth Circuit, was that the statement did not comport with the requirements for an "unsworn declaration . . . under penalty of perjury" pursuant to 28 U.S.C. § 1746. The Sixth Circuit went on to hold that, even if it credited Dawkins's "affidavit" denying that he knew Young, the document would not have not likely have resulted in an acquittal. The very same flaws exist with respect to Young's "affidavit" presented in the instant case.

"There is a preference in the federal system for joint trials of defendants who are indicted together." *United States v. Davis*, 177 F.3d 552, 558 (6th Cir. 1999) (quoting *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)). A petitioner bears a heavy

---

[3]   Courts look at such statements with suspicion. *See, e.g., United States v. Lockett*, 919 F.2d 585, 591 (9th Cir. 1990) (finding that evidence is not new when a defendant who has opted not to testify now advances testimony exculpating a co-defendant); *United States v. Jacobs*, 475 F.2d 270, 286 n. 33 (2d Cir. 1973) (a court must exercise great caution in considering evidence as newly discovered which existed all along and was unavailable only because a now-convicted co-defendant exercised his privilege not to testify).

burden to show that he was denied a fair trial by the failure to sever his trial from a co-defendant's when both allegedly participated in the same offense. *See United States v. Horton,* 847 F.2d 313, 317 (6th Cir. 1988); *see also Richardson v. Marsh,* 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (observing that joint trials avoid inconsistent verdicts and the scandal and inequity of such verdicts and also enable a more accurate assessment of relative culpability). The prejudice from a failure to sever must be of a "substantial, undue, or compelling" nature, which would have denied petitioner a fair trial and warranted a single trial to determine his guilt or innocence. *United States v. Lopez,* 309 F.3d 966, 971 (6th Cir. 2002) (citing *United States v. DeFranco,* 30 F.3d 664, 669–70 (6th Cir. 1994)). "In the context of conspiracy, severance will rarely, if ever, be required." *United States v. Searing*, 984 F.2d 960, 965 (8th Cir. 1993). Also, "[c]redibility is for the jury, but the judge is not required to sever on patent fabrications. If the testimony is purely cumulative, or of negligible weight or probative value, the court is not required to sever." *Byrd v. Wainwright*, 428 F.2d 1017, 1021 (5th Cir. 1970).

Petitioner has not carried his dual burden of showing deficient performance and prejudice under the *Strickland* test. First of all, the Court would not have granted the motion to sever given the "strong policy presumption [which] exists in favor of joint trials when charges will be proved by the same evidence and result from the same acts." *United States v. Beverly*, 369 F.3d 516, 534 (6th Cir. 2004) (citing *United States v. Hamilton*, 689 F.2d 1262, 1275 (6th Cir.1982)). In addition, Young's testimony would have served his own interests, as it is clear that he desired to establish that he was not involved in a conspiracy with Dawkins and, thus, that he was innocent of the conspiracy charge. "[S]tatements concerning the testimony that would become available by severing trials must be specific and exonerative, rather than conclusory or self-

serving, in order to justify severance." *United States v. Novaton*, 271 F.3d 968, 990 (11th Cir. 2001)

Secondly, there is a presumption that counsel gave reasonable assistance, a presumption which leads the Court to conclude that counsel made a strategic decision not to move to sever. *Strickland*, 466 U.S. at 689 (instructing that courts should presume that "counsel's conduct falls within the wide range of reasonable professional assistance ... [and that] the challenged action might be considered sound trial strategy."). *Strickland* teaches that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*. at 690. Dawkins has not shown that there was no investigation or that any investigation was not thorough, nor that counsel's presumed strategic choice was not reasonable. *Nichols v. Heidle*, 725 F.3d 516, 543 (6th Cir. 2013); *Webb v. Mitchell*, 586 F.3d 383, 395 (6th Cir. 2009) (observing that petitioner had failed to "overcome 'the strong presumption' that his trial counsel conducted a reasonable investigation") (citing *Campbell v. Coyle*, 260 F.3d 531, 553 (6th Cir. 2002)).

Third, when counsel's failure to file a motion to sever is identified as an alleged shortcoming, a petitioner "must demonstrate that the outcome of his trial likely would have been different but for counsel's errors." *United States v. Walker*, 210 F.3d 373, (table), 2000 WL 353518, *5 (6th Cir. Mar. 30, 2000) (unpublished decision). The Court finds that, even had the motion to sever been filed and granted, there is no reasonable probability of a different result. This is so because the government likely would have impeached substantially Young's testimony (i.e., that he did not know Dawkins) based on his criminal record. Had Young been tried first, his criminal history would have included the offense for which Dawkins was being tried. Had Dawkins been tried first, the prosecution doubtlessly would have subjected Young to cross-examination regarding his involvement in the conspiracy charge for which he soon would

be tried, with the risk that Young would disclose self-incriminating information regarding his own criminal activities.

Furthermore, Young would not have been allowed to testify on Dawkins's behalf that he did not know Dawkins and, at the same time, exercise his Fifth Amendment privilege as to matters involving the cocaine conspiracy. *Ohler v. United States*, 529 U.S. 753, 759-60 (2002) (noting that a defendant who decides to take the stand waives his Fifth Amendment privilege "against cross-examination on matters reasonably related to the subject matter of his direct examination.") (quoting *McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 28 L. Ed. 2d 711 (1971)). And, more than likely, the jury would not have been receptive to Young's disclaimer that he did not know Dawkins in light of the evidence presented at trial, among which was the co-conspirator's testimony and the intercepted telephone conversations between the two establishing their drug trafficking dealings.

For all the above reasons, this claim of ineffective assistance is rejected as baseless.

### vii. Counsel failed to engage in proper cross-examination of Elisa Grooms.

During Elisa Grooms's direct examination, petitioner asserts that he instructed counsel to ask her certain questions when counsel conducted cross-examination of this witness. But counsel, as was typical, ignored his client's instructions and thereby failed to elicit material facts from Grooms which would have been favorable to petitioner. The matters which counsel left unexplored, so claims Dawkins, involved Grooms's relationship with Story, Young, and other unnamed individuals. Dawkins maintains that counsel's omissions in conducting cross-examination resulted in substantial prejudice to his criminal proceedings.

As has been the case with respect to other claims, this claim is conclusory because Dawkins has not specified the specific aspects of Grooms's relationships with Story or Young

which counsel should have delved into, detailed the answers to those questions, or described exactly how those answers would have been favorable to his defense. Absent allegations such as these, Dawkins's claim of ineffective assistance is conclusory. *See Tucker v. United States*, 423 F.2d at 656 (conclusory statements in a § 2255 motion will not be credited).

Even if the claim were not conclusory and although a failure properly to cross-examine a witness could form the basis for a finding of ineffective assistance, *Jackson v. Houk*, 687 F.3d 723, 742-43 (6th Cir. 2012), such decisions typically are not subject to second guessing and are entitled to be presumed sound trial strategy. *United States v. Friedman*, 1993 WL 386797, *3 (6th Cir. Sept. 30, 1993) ("[T]actical decisions must be particularly egregious before they will provide a basis for relief.") (citing *Martin v. Rose,* 744 F.2d 1245, 1249 (6th Cir. 1984)).

Thus, counsel's decision as to how best to conduct Groom's cross examination is presumed to be a tactical decision to which this Court must defer. "Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim."*Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)). Petitioner has not adduced any evidence to overcome that presumption and, as a result, has not shown any deficiency of performance on counsel's part.

Furthermore, the transcript shows that counsel questioned Grooms about her relationship with Story, that she testified, during cross-examination by Young's attorney, that she had never seen Young and did not know who he was and that she likewise did not know of Dawkins's involvement in drug dealing, [Doc. 360, Tr. T. at 84- 87]. Thus the allegation that counsel erred by failing to question Grooms about her relationship with Story and Young is not borne out by the transcript. As to counsel's purported failure to engage in further cross-examination of

Grooms, the Court does not discern anything more favorable to petitioner's defense that counsel could have elicited had he continued to question her than that to which she had already testified. Additionally, there was a risk that any further questioning by defense counsel might elicit an answer that would be damaging to petitioner. The Court therefore concludes that Dawkins was not prejudiced by the alleged error on the part of his attorney.

This claim also lacks merit.

### viii. Counsel deprived petitioner of his right to testify.

Here, petitioner maintains that, from day one of the trial, he desired and intended to testify in his own defense and that this desire intensified following the government's case in chief and co-defendant Grooms's testimony. However, counsel manipulated and coerced petitioner into not testifying—a decision which was not voluntary or knowing and was made due to counsel's deficient performance.

"[A] criminal defendant has a fundamental constitutional right to testify on his own behalf." *Neuman v. Rivers*, 125 F.3d 315, 318 (6th Cir.1997) (citing *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987)). It is up to a defendant as to whether to exercise his personal right to testify; however, when a defense attorney makes a strategic decision not to have the criminal accused testify, defendant's assent is presumed. *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000); *see also Hodge v. Haeberlin*, 579 F.3d 627, 639 (6th Cir. 2000) ("A defendant is presumed to have waived his right to testify unless the record contains evidence indicating otherwise.") (citing *Webber*).

Here, the Court does not have to presume petitioner's assent because it is spread out on the record. The record discloses that petitioner's attorney conferred with him and advised him not to testify, that the Court told him that he had a Fifth Amendment right not to testify and,

likewise, a right to testify, if he so desired, and that after receiving that advice, he first stated that he wanted to testify, but upon further discussing the matter with counsel, ultimately decided not to testify, stating that he was comfortable with his decision, [Doc. 360, Tr. T. at 48-51].

Moreover, petitioner acknowledges that counsel advised him of the strategic implications of taking the stand, to wit, that his testimony would be countered by evidence or testimony produced by the prosecution, that his testimony would damage his and his co-defendants's case, that he would not be able to testify as to what he wanted to testify, that his testimony was not required to present the story petitioner wished to present to the jury, as that presentation could be made through counsel's closing argument, and that the testimony would result in a conviction. "Assuring that the defendant's decision is an informed one also necessitates that counsel discuss the strategic implications involved in the decision to testify." *Rayborn v. United States*, 489 Fed. Appx. 871, 880, 2012 WL 2948171, 9 (6th Cir. July 20,2012) (citing *Cannon v. Mullin*, 383 F.3d 1152, 1171 (10th Cir. 2004)).

There is not an inkling in the record, including petitioner's responses to the Court's extensive inquiry at trial into whether he wanted to exercise his right to testify in his defense, which indicates that the decision not to take the stand was anything but a voluntary and considered decision made by petitioner, based on counsel's advice not to testify.

Too, petitioner has not set forth the contents of the testimony which he would have given had counsel called him to the stand, nor has he shown that his testimony, had it been offered would have raised in the mind of a juror a reasonable doubt concerning his guilt of the criminal charges. *See Cannon*, 383 F.3d at 1171-72. Given the wealth of evidence to demonstrate that Dawkins participated in the cocaine conspiracy, and the lack of any evidence that his purported testimony would have produced the requisite doubt in a juror's mind, counsel's claimed error did

35

not result in prejudice.

**ix.** ***Counsel failed to make a Rule 29 Motion to preserve insufficient evidence arguments on appeal.***

Dawkins maintains that, after the government rested its case-in chief, counsel failed to make a motion under Rule 29, Federal Rules of Criminal Procedure, to preserve his client's right to argue insufficiency of evidence on direct appeal[4]. Beyond these bare allegations, however, petitioner offers no developed argument to show how the proof was lacking as to any element of the four offenses for which he stands convicted or to indicate how counsel gave a prejudicial performance for failing to raise any supposed evidentiary shortcoming.

Therefore, because Dawkins's contention regarding this claimed attorney failing does not state the facts supporting it, *see* Rule 2, Section 2255 Rules, it does not entitle him to relief. Furthermore, the Sixth Circuit held, in the context of resolving petitioner's appellate claim of prosecutorial misconduct, that "the evidence against Dawkins was overwhelming." *United States v. Young*, 347 Fed. Appx. at 191, 2009 WL 3073164 at *8. Because a motion for acquittal would not have been granted, given the "overwhelming" evidence against Dawkins, his counsel did not give a prejudicial performance by failing to make that motion. *Greer v. Mitchell*, 264 F.3d at 676. It therefore follows that Dawkins has not established that he received ineffective assistance from counsel in this regard.

**x.** ***Counsel failed to request jury instructions and to object to instructions given.***

In his next claim, Dawkins asserts that counsel failed to request a "buyer/seller" or a "multiple conspiracy" charge be given to the jury. Petitioner maintains that the only actual evidence showed that he engaged in buyer-seller relationships with certain individuals who have

---

[4] A timely Rule 29 motion for judgment of acquittal preserves for appeal challenges to the sufficiency of evidence. *See United States v. Chance*, 306 F.3d 356, 368-71 (6th Cir. 2002).

36

not been identified by petitioner.

    \* *Buyer-Seller Instruction*:  The Sixth Circuit has recognized that a "mere buyer-seller relationship alone is insufficient to establish a conspiracy," but that "evidence of repeat purchases provides evidence of more than a mere buyer-seller relationship."  *United States v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003) (citing to *United States v. Anderson*, 89 F.3d 1306, 1310 (6th Cir. 1996)).  At the same time, it has noted that "[a] large volume of narcotics creates an inference of conspiracy."  *Id.*  (quoting *United States v. Bourjaily*, 781 F.2d 539, 545 (6th Cir.1986)).

    First of all, as was the case with claims immediately preceding this one, petitioner has not cited to the record evidence showing that he had a buyer-seller relationship with any co-conspirator nor to proof of the existence of multiple conspiracies.  This means that this claim, like the preceding ones which were not backed up by factual allegations, is conclusory.

    Even if the claim were not conclusory, as the United States points out in its response, evidence adduced at trial through testimony by co-defendants showed that Dawkins traveled with Story four times per week and picked up from co-defendant Young some nine to eighteen ounces of powder cocaine each trip and that Dawkins converted part of the powder cocaine to crack cocaine.  Story also testified regarding a cell phone conversation between the two in which Dawkins had indicated to him that Young was going to "front" him (Dawkins) seven ounces, meaning that Young would give Dawkins the drugs so he could distribute them and could pay Young for them later.  A delayed payment arrangement, which hinges on trust between the two individuals, "suggests more than a buyer-seller relationship."  *United States v.  Nesbitt*, 90 F.3d 164, 167 (6th Cir. 1996).  Also negating that the relationship was that of a buyer-seller was the advance planning required to travel numerous times from Tennessee to South Carolina engaging

in multiple drug transactions. *Id., Brown*, 332 F.3d at 673.

Dawkins's repeated purchases of powder cocaine from Young indicates that far more than a buyer-seller relationship existed between them and the large of quantities of powder cocaine that flowed to petitioner and his co-defendants from Young over a period of time supports that the relationship between them was a drug conspiracy. *United States v. Fonseca*, 193 Fed. Appx 483, 494, 2006 WL 2440978, *8 (6th Cir. Aug. 24, 2006). Likewise testimony from co-defendants indicated that large sums of cash ($50,000-$100,000 per month) were gathered by the conspirators. This too indicates that the relationship in which Dawkins was involved with his co-defendants was a drug conspiracy.

At any rate, the jury was given proper instructions concerning the conspiracy charge and counsel did not render a prejudicial performance in failing to request a buyer-seller instruction. *Brown v. United States*, 1999 WL 1204784, *2 (6th Cir. Dec. 2, 1999) (no deficient performance in failing to challenge drug conspiracy instructions which were not impermissible

* *Multiple-Conspiracies Instruction*: Dawkins further maintains that evidence offered against his co-defendants showed the existence of multiple conspiracies involving many other alleged co-conspirators, completely unrelated to the particular conspiracies alleged in the indictment, but that counsel did not ask for a jury charge on multiple conspiracies. As noted, petitioner does not supply any specifics to explain this claim, but to the extent that he is referring to testimony concerning an individual named Carlos, who supposedly was a Mexican, or to testimony about the Mexicans, who served as sources of cocaine for Story, this does not support his allegation of a multiple conspiracies, [Doc. 359, T.Tr. at 16, Testimony of Timothy Collins; at 87, Testimony of Anthony Gudger; at 92, Testimony of Rickey Story].

As the Court correctly told the jury, "there is no requirement that all members of a

conspiracy be charged and prosecuted or tried together in one proceeding. Nor is there any requirement that the names of the other conspirators be known. An indictment can charge a defendant with a conspiracy involving people whose names are not known, as long as the government can prove that the defendant conspired with one or more of them [so that] whether they are named or not does not matter," [Doc. 359, Tr. T., Jury Instructions at 99]. Thus, any testimony offered at trial regarding Carlos or the Mexicans would not have posed a risk that the guilt of defendants involved in one conspiracy would have been transferred to defendants in another conspiracy, allowing a defendant to be "convicted for a conspiracy for which he was not indicted." *United States v. Kelsor*, 665 F.3d 685, 695 (6th Cir. 2011).

Because petitioner has not demonstrated that "the evidence [w]as such that a jury could within reason find more than one conspiracy," *Id.* (quoting *United States v. Warner*, 690 F.2d 545, 551 (6th Cir. 1982), no multiple-conspiracies instruction was needed and counsel did not give ineffective assistance by failing to request that instruction.

### xi. Counsel failed to turn over petitioner's complete criminal files upon his request.

Citing to *Aron v. United States*, 291 F.3d 708 (11th Cir. 2002), petitioner claims that trial attorney Wyss refuses to release his complete criminal files including discovery results, pleadings, documents, transcripts, DVDs, CDs, cassette tapes, VHS tapes, etc., and that counsel's refusal has prejudiced Dawkins's appellate process and his § 2255 proceedings. Dawkins surmises that he might find in those files additional instances of ineffective assistance or locate issues related to the wiretap process or other matters.

*Aron* does not help Dawkins. *Aron* involved questions as to whether a petitioner had been diligent in raising claims past the one year statute of limitations for filing a § 2255 motion. Because there is no question that Dawkins's motion to vacate was timely, it does not appear that

*Aron* is apposite to any issue actually raised in this case.

Furthermore, *Strickland* instructs that "[c]ounsel's performance must be assessed according to the time of representation, rather than viewed with the benefit of hindsight." *Hanna v. Ishee*, 694 F.3d 596, 612 (6th Cir. 2012). Attorney Wyss's alleged errors and omissions must be examined as of the time of the representation, which did not extend to the appeal or to the motion to vacate. *Wiggins v. Smith,* 539 U.S. 510, 523 (2003) ("[W]e must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time[.]")(quotation marks and internal citations omitted). Thus, Dawkins has not presented a true claim of ineffective assistance of *trial* counsel.

Even if petitioner has presented such a claim, the record refutes it. As the United States points out in its response, Attorney James J. Lonon, petitioner's appointed sentencing and appellate counsel, has submitted an affidavit in which he testifies that he met with Attorney Wyss, reviewed the file, and took possession of the necessary contents, [Doc. 528-3, Affidavit of James J. Lonon]. Attorney Lonon further states that he sent various portions of his own voluminous file to petitioner, upon his requests, on six different occasions (September of 2008 to February of 2010) and that, ultimately, in July of 2010, again in response to petitioner's request, copied the entire file, including the previously-provided parts, and sent it to petitioner at his federal prison. The Lonon affidavit also counters petitioner's contentions against Mr. Lonon, i.e., that he was ineffective for failing to supply his client with copies of the appellate file.

***xii. Appellate counsel failed to brief and argue the district court's denial of Dawkins's motion to relieve counsel from the representation due to a breakdown in the attorney-client relationship.***

As the United States points out in its response, this claim contains no factual elaboration.

The lack of any factual support renders the claim conclusory and, as discussed previously, conclusory claims will not establish a constitutional violation. *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991).

Even if the claim were not conclusory, it lacks merit. As the Court has already determined, *see* section II.D.1.b, claim "iv", *supra*, Dawkins's complaints concerning his counsel's representation were legally baseless and he failed to show "good cause" to relieve Attorney Wyss from the representation. Appellate counsel cannot be ineffective for failing to raise a groundless claim, as no prejudice flows from that failure. *Greer v. Mitchell*, 264 F.3d at 676.

> *xiii. Appellate counsel failed to brief and argue meritorious issues which were properly preserved during trial.*

Dawkins maintains that the omitted issues were clearly stronger than those presented, but he makes no attempt to support his allegations with any developed argument, though it is he who is responsible for constructing those arguments. While petitioner invites the Court to "see" his affidavit, presumably, for the purpose of determining the nature of those omitted and "clearly stronger" issues, the Court declines to perform that task for him by searching through his affidavit to find support for this asserted claim. Thus, as pled, the claim is conclusory; bare, conclusory allegations unsupported by facts, will not show a constitutional violation. *Lynott v. Story*, 929 F.2d at 232.

To sum up, all alleged instances of ineffective assistance of counsel raised as grounds for relief in Dawkins's § 2255 motion to vacate are baseless, have been rejected, and do not justify relief.

## 2. Due Process Violation

In his last claim, Dawkins asserts that evidence obtained after his conviction shows that the prosecution's key witness, Ricky Story, fabricated testimony against petitioner to curry favor with the U.S. Attorney and law enforcement personnel. The new evidence consists of the "affidavit" of Terrance Fields who is presently confined with petitioner in the U.S. Penitentiary McCreary, who was housed at the Washington County jail with Story, [Doc. 478-1]. Fields states, in his affidavit, that Story advised him to "jump on the wagon," which meant that Fields should "say that he had dealings with [Story] and his codefendants," and "arrange a proffer through [his] attorney," [Doc. 478-1 at 1-2]. Fields furthers states, in this document, that Story told him that, while he had never met "this dude from South Carolina," federal authorities wanted him to say that the South Carolinian had supplied both Dawkins and himself with cocaine. Petitioner asserts that because he heard "scuttlebutt" at the jail concerning Story's efforts to secure for himself a reduced sentence by attempting to recruit others to fabricate testimony against innocent people, he urged Attorney Wyss to interview inmates housed with Story. Counsel did not pursue the suggested line of inquiry and Dawkins now contends that counsel's failing in this regard resulted in a violation of his [Dawkins's] right to due process, a violation which occurred, presumably, when Story offered fabricated testimony.

An initial review of this document shows that it suffers from the same infirmities as the purported "affidavit" offered by Young which was discussed earlier in this opinion, [*supra* at II.D.1.b.vi.1 & vi.2 at 28-29]. The document is titled, "Sworn Affidavit of Terrance Fields," but the "affidavit" is not notarized and does not show that Fields was administered an oath by an authorized person. Nor does the document adhere to the requirements for an "unsworn declaration . . . under penalty of perjury" pursuant to 28 U.S.C. § 1746.

In its response, the United States correctly points out that Fields's affidavit is, at most,

impeaching evidence, the introduction of which at trial would not have produced an acquittal. This is so, according to the United States, given that the proof at trial, consisting of physical evidence and testimony of co-defendants, confidential informants, and law enforcement agents, established that Dawkins and Story were involved in the Washington County, Tennessee, drug distribution conspiracy of which they were convicted.

The Court concludes that, since the proof against Dawkins, according to the Sixth Circuit, was overwhelming, the slight impeachment evidence disclosed in this "affidavit" would not have generated a different verdict. Nor do the statements made in Fields's "affidavit," even if believed, necessarily show that Story testified falsely at trial. After all, there was testimony that Story had never been introduced formally to Young or had a direct conversation with him, but that he nonetheless knew him. The Court concludes that Fields's "affidavit," based on the caliber of the statements contained therein, would not be sufficient to justify granting petitioner a new trial, *see United States v. Quiles*, 618 F.3d 383, 395 (3d Cir. 2010) (to obtain a new trial, newly discovered impeachment evidence must bear a strong connection to the charges against a defendant or "totally undermine critical evidence of guilt"), much less to overcome the necessarily high hurdle to obtain collateral relief. *United States v. Frady*, 456 U.S. 152, 166, 102 S.Ct. 1584, 1593 (1982) ("We reaffirm the well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."). To the extent that such a claim was not discoverable earlier and has not been procedurally defaulted by petitioner's failure to raise it in his direct appeal, it has no merit.

## E.  Conclusion

For the reasons set forth above, the Court holds that petitioner's convictions and sentencing were not in violation of the Constitution or laws of the United States. Accordingly,

his motion to vacate, set aside or correct his sentence under to 28 U.S.C. § 2255 will be **DENIED** and his motion **DISMISSED**.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals disapproves of the issuance of blanket denials of certificates of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). The district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id*. at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Id*.

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Having examined each of the petitioner's claims under the *Slack* standard, the Court finds that reasonable jurists could not conclude that this Court's dismissal of petitioner's claims was debatable or wrong. Therefore, the Court will deny petitioner a certificate of appealability as to each claim raised.

A separate judgment will enter.


ENTER:

                                                    s/J. RONNIE GREER
                                            UNITED STATES DISTRICT JUDGE

44